CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAY 0 8 2007

JOHN F. CORCORAN, CLERK
BY: /s/
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | |
|---|---|
| RUSSELL ADAM PELLETIER, ) <br> Petitioner, ) | Civil Action No. 7:06-cv-00582 |
| ) | |
| v. ) | **MEMORANDUM OPINION** |
| ) | |
| MR. ROBINSON, WARDEN, ) <br> Respondent. ) | By: Hon. James C. Turk <br> Senior United States District Judge |

Petitioner Russell Adam Pelletier, a Virginia inmate proceeding pro se, brings this action as a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254.[1] Pelletier challenges the validity of his confinement pursuant to the 2002 judgment of the Circuit Court for Louisa County convicting him of capital murder, rape, and use of a firearm during commission of murder.[2] He is currently serving two life sentences imposed for these crimes. The respondent filed a motion to dismiss to which petitioner responded, making the matter ripe for the court's consideration. Upon review of the record, the court concludes that the motion to dismiss must be granted.

## I

Pelletier was indicted and charged with several crimes against twenty-three year old Aimee Marie Meadows on or about November 12, 2000: Rape in violation of Virginia Code § 18.2-61 (CR01-8193); capital murder during the commission of or subsequent to rape in violation of Code § 18.2-31 (CR01-8201); using a firearm during the commission of murder in violation of Code § 18.2-53.1 (CR01-8186); and possession of a firearm by a previously convicted felon (CR01-8187). He pled not guilty and proceeded to trial before a jury in the Circuit Court for Louisa County on June 3-10, 2002.

---

[1] Pelletier originally filed this action in the United States Court for the Eastern District of Virginia, Richmond Division. That court transferred the case to this court, inasmuch as the conviction under challenge occurred within the jurisdiction of this court and petitioner is confined in this district. See 28 U.S.C. § 2241(d).

[2] Pelletier also stands convicted of possession of a firearm by a previously convicted felon, for which the court sentenced him to two years in prison. He does not challenge this conviction or sentence in his federal petition.

1

The Court of Appeals of Virginia summarized the evidence adduced at Pelletier's trial as follows:

> Pelletier and Meadows both resided in Blue Ridge shores, a subdivision located in Louisa County. Meadows left the family home to walk the dog after supper on November 12, 2000. She did not return. Her father, increasingly concerned about his daughter's welfare, began calling for her and the dog about 8:00 p.m. The dog returned alone about two hours later. An extensive search of the area proved unsuccessful. At 11:24 p.m., Meadows's father notified the police that his daughter was missing.
>
> Officer MacKay had been notified at 8:05 p.m. of a "domestic situation" at the Pelletier residence involving Pelletier and his mother. MacKay began looking for both Meadows and Pelletier, but found neither.
>
> Meadows's body was ultimately discovered around noon on November 13, 2000 by a Blue Ridge Shores resident. Her body was floating about twelve to fifteen feet from a point of land which extends into a lake. A wound to the back of her head, two inches behind the ear and below the earlobe, was observed.
>
> At trial, Penny Radecker testified that she heard a gunshot about a half-hour or hour after she started using her computer at 10:00 p.m. the night Meadows failed to return home. Radecker's house is a two-minute walk from the beach area where Meadows's body was found.
>
> Shawn Lamb, a friend of Pelletier, received a telephone call from Pelletier between 10:30 and 11:00 on the same night. Pelletier told Lamb he had shot and killed a girl and threw her body into the lake. Lamb did not know Meadows and initially gave little credence to Pelletier's account. When he heard media reports about the killing, he contacted police and agreed to cooperate with their investigation by wearing a "wire" when he visited Pelletier's home on November 16, 2000. Pelletier told him that he met a "girl" walking and that he "started slapping her around, took her by the woods, told her to take her clothes off and . . . to shake that ass." He said that, after the rape, they "went down to this boat," which he rowed to the middle of the lake. He asked Meadows if she intended to tell her parents about the rape. He then told her to look at him, put a gun against her head, and shot her. He described the shot as "close" to the victim, such that it "kind of like splattered." Pelletier also told Lamb that "it was too much to row back so he threw [the victim] over into the lake." When he got back to the "bank or dock," Pelletier said he sank the boat.
>
> Andrew Lettner, another friend of Pelletier, was present when Pelletier talked to Lamb. He heard Pelletier state that, after he "had sex" with Meadows, "they went to the beach," got "in a boat and the girl ended up dead." Lettner testified that Pelletier said that he had pulled the gun on her, told her to undress, made her bend over and raped her. After telling "the girl" to put her clothes back on, he forced her to walk to the beach and "made her get into the boat." After she stated her intention to tell her father about the rape, Pelletier "grabbed her by the back of the head and shot her once." Lettner also testified that Pelletier said he threw "the girl's" body in the water, rowed back to the shore, wiped his fingerprints off and walked home.
>
> While in jail, Pelletier wrote a letter to Lettner, which was introduced into evidence, asking Lettner to lie about what happened and explaining the approach he wanted Lettner to take:
>
>> We were chilling [at Pelletier's house] drinking. After a while we saw Amy [sic] walking her dog up the street. I called her over to us. The dog left. I asked if I could fuck. She said OK. So I fucked it,

2

while you keep drinking.... Any side question they ask say I don't know I was drunk. When I finished fucking, Amy [sic] asked for some beer.... She left about 7:30. If they ask how we know, you had a watch on. We chilled and drank till 8:30. You made a phone call for a ride. About 9:00 you left and went home or wherever. I'm fine after that. You got to memorize this shit. I need you bad on this. ... I walk away from this two ways. A dead man or a rich man. I wanna be rich. When this is in your head till it hurts, *burn this letter!*

Dr. William Gormley, Assistant Chief Medical Examiner to the Chief Medical Examiner's Office in Richmond, Virginia, testified at trial and concluded that Meadows's death was caused by a gunshot wound with a bullet passing through the brain. Other studies were also conducted by Dr. Gormley, and blood and vaginal swabs were collected.

James Pickelman testified as an expert in firearms identification. He reported the results of his examination of the bullet taken from Meadows's body and its comparison with a bullet found in the ceiling of Pelletier's bedroom. Both bullets came from a .38 caliber weapon, which could include a .357 caliber weapon, and both had five lands and grooves which twisted to the right. Pickelman concluded that bullets were similar and the possibility that both had been fired from the same weapon could not be eliminated.

Lisa Shiermier, an expert in DNA analysis, testified that Pelletier's genetic material was present on vaginal swabs and on the wrist area of the left sleeve of a shirt recovered from the floor next to the foot of Pelletier's bed. The stain was a mixture of blood and another fluid. A hair found wrapped on the brace that held the fire extinguisher inside a boat found on the other side of the lake was determined to be consistent with Meadows's DNA profile. The owner testified that, to his knowledge, Meadows had never been in his boat.

The Commonwealth also successfully admitted dog trailing evidence by calling two additional expert witnesses, Detective Stuart L. Garner and Sgt. Patrick Sheridan.... Garner and his dog, Ranger, trailed Pelletier on November 15, 2000 beginning from the point on the beach where Meadows's body was recovered from the lake. The bloodhound was alerted to the scent by a towel collected from Pelletier's home. Garner interpreted Ranger's body language as signifying the presence of Pelletier's scent at that location. The trail led from the beach, to the clubhouse, out to the main street, South Lakeshore Drive, into a yard, and back to the roadway. Ranger followed the scent to the door of Pelletier's residence, where the dog indicated the trail ended.

Garner and Ranger also trailed Meadows's scent, starting at the front door of her residence and proceeding to the beach, passing by the clubhouse, and then proceeding west past some boat docks and another large building. The trail led into a wooded area along a path to a bluff, then to flat ground and the water's edge. Garner described an area of "pool scent"[3] at this location and testified that the dog's body language indicated that "something had happened here." Ranger eventually left the "pool scent" area and trailed along the water's edge ending on the point of land nearest the place where Meadows's body was recovered. Garner opined that Meadows had either left the pool scent area and entered the water, or had actually been on the point of land. He conceded, however, that the scent Ranger detected on the point of land could have drifted there from a location on, or in, the water.

---

[3]Garner described "pool scent" as a large amount of scent.

3

> Sheridan and his bloodhound, Annie, also trailed Meadows and Pelletier and obtained similar results. . . .
>   In the Defense's case-in-chief, Pelletier called Michael Taylor, a friend of Meadows. But for a sustained hearsay objection, Taylor would have testified that Meadows told him that she and Pelletier had been having consensual sexual relations for over two months. Taylor also would have testified that Meadows told him that she had been having sex with her fiancé, Steve Piatt, unbeknownst to her father, Darrell Meadows, who denied knowledge of any of Meadows's sexual encounters.
>   Pelletier also testified in his own defense. He claimed he had engaged in consensual sex with Meadows in the woods near his home. He said they were interrupted and that she left after he gave her some beer. He denied talking by telephone to Lamb on November 12, but admitted he told Lamb that he had raped and killed Meadows, explained he was "just messing with him." Pelletier also claimed Lamb brought a gun into his house and fired into the ceiling. Lamb denied doing so and denied owning a gun. Pelletier also admitted asking Lettner to lie for him, but claimed he could not remember making most of the other statement s Lettner attributed to him. He admitted he told Lettner that he ordered Meadows to "shake ass and everything" and that he had "shot her in the head or something."

Pelletier v. Commonwealth, 592 S.E.2d 382, 384-87 (Va. App. 2004), petition for app. refused, Record No. 052145 (Va. March 21, 2006).

After hearing this evidence, the jury found Pelletier guilty on all four charges and fixed his sentences at life in prison for the capital murder and rape, three years for illegal use of a firearm, and two years for illegal possession of a firearm by a felon. The circuit court denied a defense motion to set aside and entered its judgment, consistent with the jury's verdict, on November 4, 2002.

Pelletier appealed his convictions for rape, capital murder, and illegal use of a firearm to commit murder to the Court of Appeals of Virginia. As to these convictions, he raised the following issues on appeal:

1. The trial court erred under Virginia law in allowing the "dog tracking" evidence of the route from the murder site to Pelletier's house;

2. The trial court erred by refusing to allow Michael Taylor to testify to hearsay statements allegedly made to him by the victim two days before she was murdered about having consensual sex with Pelletier; and

3. The trial court erred by refusing to allow Michael Taylor to testify that the victim told him she would sneak downstairs to have sex with her fiancé, Steve Piatt.

The Court of Appeals of Virginia affirmed Pelletier's convictions on February 10, 2004, and the Supreme Court of Virginia refused his petition for appeal on June 4, 2004.

Pelletier then filed a habeas petition with the Circuit Court for Louisa County, which he later amended. The circuit court dismissed the amended petition without an evidentiary hearing, by order dated July 28, 2005. (Law No. 4580). The Supreme Court of Virginia refused his petition for appeal on March 21, 2006. (Record No. 052145).

In his federal petition, Pelletier alleges the following grounds for relief:

1. Counsel were ineffective for failing to include in their motion to set aside "new evidence" from Cindy Garrison received after trial so it would be preserved for direct appeal;

2. Defense counsel were ineffective for failing to add a Constitution-based argument concerning defense witness Michael Taylor to their motion to set aside, and Mr. Snook was ineffective for failing to add this argument on direct appeal;

3. The prosecutor was guilty of misconduct because during his opening statement to the jury he mentioned a videotape the judge had said was questionable and would prejudice the defense;

4. Defense counsel were ineffective because they did not object to the prosecutor's improper opening statement;

5. A prosecution expert withheld information about DNA testing that would have been favorable to the defense;

6. Defense counsel were ineffective for failing to object to the DNA expert's testimony;

7. Defense counsel were ineffective in failing to raise a Constitution-based objection to the testimony of Shawn Lamb, who wore a "wire" when he talked to petitioner; and

8. The evidence was insufficient to prove the case beyond a reasonable doubt.

## II

Respondent concedes that Pelletier has exhausted state court remedies as to all of his current habeas claims, either by presenting them to the Supreme Court of Virginia on direct appeal or in state habeas proceedings, see Sullivan v. Boerckel, 526 U.S. 838, 846 (1999), or because they would now be procedurally defaulted under Virginia's successive petition rule, Virginia Code Ann. § 8.01-654(B)(2). Teague v. Lane, 489 U.S. 288, 298 (1989); Baker v. Corcoran, 220 F.3d 276, 288 (4th

Cir. 2000). Pelletier argues, however, that his procedural defaults should be excused because he can show actual prejudice or in the alternative, that he is actually innocent.

To the extent that the Virginia courts have adjudicated Pelletier's habeas claims, this court may grant habeas relief only under the standard set forth in 28 U.S.C. § 2254(d)(1):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"Under §2254(d)(1)'s 'unreasonable application' clause . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams v. Taylor, 529 U.S. 362, 411 (2000).

### A. Ineffective Assistance of Counsel Claims

To prove that his counsel's assistance at trial or sentencing or on appeal was so defective as to require reversal of his conviction or sentence, a convicted defendant must meet a two prong standard, showing both counsel's defective performance and resulting prejudice. Strickland v. Washington, 466 U.S. 668, 687 (1984). First, petitioner must show that "counsel's representation fell below an objective standard of reasonableness," considering circumstances as they existed at the time of the representation. Id. at 687-88. Petitioner must overcome a strong presumption that counsel's performance was within the range of competence demanded from attorneys defending criminal cases. Id. at 689. Even if he shows that counsel performed deficiently, petitioner is not entitled to habeas relief unless he can satisfy the second Strickland prong by showing that counsel's errors "actually had an adverse effect on [petitioner's] defense." Id. at 693. At a minimum, petitioner must demonstrate "a reasonable probability" that but for counsel's errors, the result

6

reached by a reasonable and impartial fact finder would have been different. Id. at 694-95. If it is clear that petitioner has not satisfied one prong of this Strickland test, the court need not inquire whether he has satisfied the other prong. Id. at 697. A habeas petitioner is "entitled to an evidentiary hearing only to resolve disputed issues of material fact," and therefore, will not warrant a hearing unless he first presents "a colorable claim to relief by showing that the alleged additional facts, if true, would at least arguably compel the granting of the writ."[4] Poyner v. Murray, 964 F.2d 1404, 1422 (4th Cir. 1992).

**Claim 1: Cindy Garrison Evidence**

Pelletier alleged that a few days after trial, he received a letter from Cindy Garrison, stating that a man named "Andy" had confessed to her that he committed the crimes for which Pelletier was convicted. Pelletier forwarded a copy of the letter to counsel. At his request, Ms. Garrison also met with counsel and revealed that "Andy" Lettener (a prosecution witness), the author of the letter, had taken her and two other individuals to the crime scene, where he offered details of the crimes and confessed to committing them. Pelletier asked counsel to include Ms. Garrison's statement in a Motion to Set Aside the Verdict and to question the other two witnesses about Lettener's confession as a means of confirming Garrison's story. Counsel did not question these witnesses or include Garrison's statement in the Motion.

In state habeas proceedings, counsel filed an affidavit, stating that he had asked Garrison to bring him anything that would corroborate her story; although she said she would "work on that and call [counsel] back," he never heard from her again. Counsel stated that he did not include the Garrison information in the Motion to Set Aside because he did not want to file it "without support" and thus "lose it for all time." Also, at trial, the prosecution introduced into evidence a letter that Pelletier had written a letter to Andy Lettner, asking him to lie and provide an alibi for Pelletier.

---

[4]Once he has alleged facts demonstrating a ground for habeas relief, a petitioner must also demonstrate that he developed or attempted to develop those facts in state proceedings. See 28 U.S.C. § 2254(e)(2).

7

Counsel did not want to "file a motion for a new trial based on suspiciously convenient new testimony from someone who ought to be able to provide support for it but couldn't."

The circuit court denied habeas relief under Strickland because Pelletier did not proffer the testimony Garrison and the other two witnesses would have given. See Bassett v. Thompson, 915 F.2d 932, 940 (4th Cir. 1990) (finding that habeas petitioner cannot prove ineffective assistance claim on general allegation that additional witnesses should have been called in mitigation without proffer of testimony such witnesses would have offered). The habeas court further found that even if the three witnesses would have corroborated Pelletier's claim of innocence, it would not have produced "opposite results on the merits at another trial," as required to prevail in a motion for new trial:

> Given that the evidence of Pelletier's guilt was overwhelming, including the scientific evidence and Pelletier's own statements admitting his guilty, plus his failed attempt to procure perjury while he was incarcerated awaiting trial, it cannot be said that a reasonable juror *should* have accepted as true another obviously concocted attempt to shift the blame to an innocent person. See, e.g., Odum v. Commonwealth, 225 Va. 123, 131, 301 S.E.2d 145, 149 (1983) (it could not be said that post-trial confession to crime by defendant's brother "should produce opposite results on the merits at another trial").

Even now, in the federal habeas proceedings, Pelletier does not present any corroboration of Garrison's allegations against Andy Lettner. As such, he does not prove any reasonable likelihood that the "new evidence" counsel allegedly failed to discover would have resulted in a different outcome on the motion for new trial, given the other extensive evidence against him, his own confession, and his demonstrated willingness to lie. As he has failed to meet his pleading burden under the prejudice prong of Strickland, no evidentiary hearing is warranted under Poyner. 964 F.2d at 1422. This court cannot find that the state courts' disposition of this claim was contrary to, or an unreasonable application of, Strickland or that it was based on an unreasonable determination of facts. Therefore, the court will grant the motion to dismiss, pursuant to § 2254(d).

8

**Claim 2: Michael Taylor Argument**

The defense moved at trial to admit Michael Taylor's testimony that the victim, Aimee Meadows, had told him two days before her death "that her [sic] and [Pelletier] were having relations with each other off and on for a course, a period of two months or more." (Tr. 168). Although Taylor admitted that he had never seen Pelletier and Meadows together, the trial judge allowed Taylor to testify that Meadows had told him that she felt Pelletier was a "very nice person and that she really liked him." (Tr. 204-205). Taylor admitted that he did not question Meadows in any "detail about what [she] and [Pelletier] had done." (Tr. 169).

On direct appeal, the Court of Appeals of Virginia held that the trial judge properly applied Virginia's hearsay exception rules in refusing to admit part of Taylor's proffered testimony about what the victim had told him. Specifically, Pelletier argued that Meadows' statement about "having relations" with Pelletier fell within an exception to the hearsay bar because it was against her penal interest. The Court of Appeals found that Pelletier had failed to prove that Meadows "subjectively believed she was making a statement against her penal interest when she admitted to sexual relationship outside of marriage." 592 S.E.2d at 391. Pelletier also argued on appeal that disallowance of Taylor's testimony violated his constitutional right to confrontation. The appellate court dismissed this aspect of his claim because he first raised it to the trial court in the post-conviction motion to set aside. 592 S.E.2d at 390 n. 4.

In state habeas proceedings, Pelletier argued that counsel were ineffective because they failed to include in the post-trial motion to set aside and on appeal an argument that the partial exclusion of Taylor's testimony was a "Constitutional violation under the Due Process Clause." Counsel admitted during state habeas proceedings that he had no tactical reason for failing to make constitutional arguments challenging the exclusion of Taylor's testimony. The habeas court noted, however, that counsel's self-professed error did not prove counsel's actions were constitutionally deficient, see Stringer v. Jackson, 862 F.2d 1108, 1116 (5th Cir. 1988), and in any event, the court denied relief because Pelletier failed to demonstrate resulting prejudice under Strickland.

9

In this federal petition, Pelletier asserts that counsel should have presented the constitutional arguments in a timely manner so they would not have been barred on appeal. He asserts, "If there is evidence that shows he is innocent of the crime [of rape] and that the evidence is found trustworthy, then it should be allowed!" Pelletier believes that the excluded testimony would have proved that he and Meadows had consensual sex and that "without rape, there is no motive for murder."

This court agrees with the state habeas court that this claim fails under the prejudice prong of <u>Strickland</u>. At most, the excluded statements might have provided partial corroboration of Pelletier's testimony that he had had consensual sex with Meadows. The jury clearly did not believe Pelletier's testimony or his assertion that he was joking when he told others that he had raped and murdered Meadows. The court finds no reasonable probability that additional Taylor testimony would have persuaded jurors to accept Pelletier's story, in light of the state's other strong evidence tying him to the crimes. As Pelletier fails to prove prejudice, the court need not address whether counsel's omission of the constitutional issues was deficient performance under <u>Strickland</u>. The state courts' disposition of this claim was not contrary to, or an unreasonable application of, federal law and was not based on an unreasonable determination of facts. Therefore, the court will grant the motion to dismiss as to Claim 2.

**Claim 4: Prosecutor Comments about Video**

Pelletier asserts in Claim 4 that counsel were ineffective for failing to object when, in his opening statement on June 4, 2002, the prosecutor told jurors details about a videotape of Pelletier's comments to the media after his arrest. The defense objected before trial to admission of the videotape, but the judge withheld ruling on the objection until he had a chance to view the tape on the evening of the opening day of testimony. The next morning the judge announced his decision to bar introduction of the videotape because it did "not meet the test of being both relevant and material" and was more prejudicial than probative. (Tr. 307-08). The judge said that he would

10

reconsider the exclusion order if the Commonwealth presented testimony to provide context for Pelletier's statements on the videotape,[5] but the Commonwealth did not pursue the matter further.

Pelletier claims that counsel should have objected to the following portion of the opening statement, describing Pelletier's behavior and comments to reporters as he was being transported to the Louisa County Sheriff's Office:

> I'm going to introduce [a video tape] that is the one with the basic footage, the raw footage that's unedited and you'll see . . . the attitude of Adam Pelletier. You'll see what he looks like, what he says. You'll see his attitude and you'll see how that he's laughing and he says--he screams at the camera, I'll do it again. Now, he may have some alternate explanation for that but the Commonwealth believes that the it that he's referring to is the murder of Aimee Meadows, that he's a bad man or he is maybe in the vernacular, he's a bad ass and he cannot be harmed. He's beyond the authorities to do anything about it. You will see that he--when the reporters ask him, you'll see what he says and you'll see his attitude.

(Tr. 87-88). In his opening statement, defense counsel told the jurors the defense response to the videotape evidence:

> First of all, just to take the last thing first, the videotape that [the prosecutor] mentioned. If you look at the videotape, you won't know what it is that Adam is saying or what's he's referring to when he says, I'll do it again. The one thing you will be clear on is that something some reporter did or said caused Adam to get very angry very quickly and that he basically--and Adam will tell you, I expect, what it was he was reacting to at that point, what he meant when he said, I'll do it again. It is not in the context of a reporter shouting a question, did you kill Aimee Meadows and he responds, I'd do it again. That's not what happened.[6]

(Tr. 94-95).

The state habeas court dismissed the videotape claim under Strickland, finding no deficient performance or prejudice. Pelletier's counsel made a strategic decision to give his own characterization of the videotape for the jury rather than objecting to the prosecutor's version. Not only was this tactic reasonable on its face, but it also benefitted the defense, as it left jurors wondering why the Commonwealth had not played the videotape as promised. The court cannot

---

[5]The videotape was Commonwealth's Exhibit 17, but was submitted for identification purposes only.

[6]Pelletier claims that at the time the videotape was shot, he had just told a joke to a reporter, who said "There goes your ten minutes of fame," and in response to this comment, he told the reporter, "I'll do it again."

11

second guess counsel's reasonable strategic choice and finds no prejudice resulting from that choice. As the claim clearly fails under Strickland, the court will grant the motion to dismiss, pursuant to § 2254(d).

**Claim 6: No Objection to DNA Testimony**

Pelletier asserts in Claim 6 that counsel were ineffective in failing to object to the testimony of the state's DNA expert, Ms. Shiermier, "about [Pelletier's] DNA being 1 in 2.0 million when asked about the vaginal swab, when she admitted that she did not do a 3 slot allele profiling test," causing the jury to be misled about the DNA evidence. Since his incarceration, Pelletier says, he has studied DNA testing and believes that Shiermier should have done additional testing.

The state habeas court rejected this claim for three reasons: (1) Pelletier failed to offer evidence showing that Shiermier's "profiling" testimony was wrong; (2) disagreement with the expert's testing methods does not make her testimony objectionable or inadmissible, but rather, goes to the weight of the evidence; and (3) Pelletier failed to show a reasonable probability that an objection to Shiermier's testimony would have resulted in a different outcome in the trial. Pelletier fails to demonstrate how this disposition of his claims by the Virginia courts is contrary to, or an unreasonable application of, Strickland, or that it was based on any unreasonable determination of facts. Accordingly, the court will grant the motion to dismiss, pursuant to § 2254(d).

**Claim 7: Shawn Lamb's Testimony**

Shawn Lamb testified that once he heard news reports about the killing, Lamb told authorities about Pelletier's telephone confession and agreed to visit him, wearing a recording device. Lamb did not tell Pelletier that he was helping the police. He simply began asking Pelletier questions about the victim. Pelletier alleges that as a joke, under the influence of alcohol, he decided to "mess" with Lamb by saying that he had raped and murdered Meadows and giving details about the crimes. He claims that counsel were ineffective for failing to move for suppression of Lamb's testimony because Lamb did not give Pelletier his Miranda rights before questioning him.

12

The state habeas court dismissed this claim because <u>Miranda</u> warnings are only required when police subject a suspect to <u>custodial</u> questioning; Pelletier was in his own home when Lamb questioned him. See <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966). It is well established that police do not have to give <u>Miranda</u> warnings before "general questioning of citizens in the fact-finding process." <u>Id.</u> at 477. Counsel cannot be found ineffective for omitting a meritless objection. Thus, the court cannot find that the state courts' disposition of this claim was contrary to, or an unreasonable application of, federal law or based on an unreasonable determination of facts and will grant the motion to dismiss.

### B. Procedurally Defaulted Claims

When the state court expressly relied on an independent and adequate state procedural ground in dismissing a constitutional claim, whether on direct appeal or in habeas proceedings, federal habeas review of the claim is also barred, absent a showing of cause and prejudice or actual innocence. See <u>Gray v. Angelone</u>, 518 U.S. 152, 162 (1996). To show cause, petitioner must demonstrate that some force outside himself prevented him from bringing the claim earlier or from learning of the facts necessary to bring the claim earlier, although he exercised reasonable diligence to discover such facts. <u>Murray v. Carrier</u>, 477 U.S. 478, 487-88 (1986). Errors of counsel may serve as cause to excuse the procedural default of a specific constitutional claim, but only if petitioner demonstrates (1) that the errors were so egregious that they violated petitioner's constitutional right to effective assistance of counsel, <u>Strickler v. Green</u>, 527 U.S. 263, 283 (1999), and (2) that the ineffective assistance claim itself is not procedurally defaulted, <u>Edwards v. Carpenter</u>, 529 U.S. 446, 453 (2000). The mere fact that the petitioner acted <u>pro se</u> in the earlier habeas proceeding and had little or no legal knowledge does not establish cause to excuse his default of a claim. <u>McCoy v. Newsome</u>, 953 F.2d 1252, 1258 (11th Cir. 1992).

### Claim 3: Improper Prosecutor Comments

Pelletier raises a separate claim of prosecutorial misconduct, based on the prosecutor's opening statement mention of the videotape that was later excluded. He did not, however, raise such

13

a claim on direct appeal. When he presented the claim in his state habeas petition, the state court dismissed it as procedurally defaulted under the rule in Slayton v. Parrigan, 205 S.E.2d 680 (Va. 1974) that habeas proceedings cannot be used as a substitute for trial and appeal. See Fisher v. Angelone, 163 F.3d 835, 844 (4th Cir. 1998) (finding that the United States Court of Appeals for the Fourth Circuit has "repeatedly recognized that 'the procedural default rule set forth in Slayton constitutes an adequate and independent state law ground for decision'").

Pelletier argues that his default of Claim 3 should be excused because counsel were ineffective when they failed to raise this claim on direct appeal. This "cause" argument fails, however, because the court has already found that counsel were not constitutionally ineffective for failing to object to the prosecutor's opening statement reference to the videotape. Pelletier's lack of legal knowledge cannot serve as cause, and he offers no other excuse for his failure to raise this claim on direct appeal. Thus, his cause and prejudice arguments for Claim 3 fail.

**Claim 5: DNA Testing Problems**

Pelletier claims that the DNA expert, Shiermier, erroneously testified that she had no way to determine whether blood found on his shirt sleeve was his or the victims. She testified that her tests of the stain on the sleeve indicated the presence of DNA from both Pelletier and Meadows and that the stain contained blood and some other substance. When asked if there was a way she could determine whose blood it was, she said no. Pelletier asserts that she did, in fact, have a method by which to determine whose blood it was, but failed to disclose this fact or perform the test. The state court found this claim to be procedurally barred under Slayton because Pelletier did not raise it on direct appeal. Thus, it is procedurally barred from federal habeas review.

As cause for his default, Pelletier claims that he did not discover "new evidence" necessary to this claim until his appeal was complete. Specifically, he asserts that only after he was incarcerated at Wallens Ridge State Prison, where he studied a DNA reference manual, did he discover the DNA test that he believes Shiermier should have done, but failed to disclose at trial; he also believest that this test would prove the stain on his sleeve did not contain the victim's blood.

14

In support of this assertion, he offers nothing more than his own, self-serving interpretation of the data in Shiermier's test results.

Even if he could prove the validity of his inexpert DNA analysis, however, he fails to show cause for his default of the claim. Shiermier's test data was "available" to Pelletier at the time of trial, but he failed to pursue it at that time. An absence of reasonable diligence by the petitioner will defeat an assertion of cause.[7] Hoke v. Netherland, 92 F.3d 1350, 1354 n. 1 (4th Cir. 1996). Although he also alleges that counsel's ineffectiveness in failing to raise this claim on appeal should serve as cause to excuse his default, he has never presented this ineffective assistance claim to the Supreme Court of Virginia; because the claim would now be procedurally barred under Virginia's rule against successive habeas petitions, Va. Code § 8.01-654(B)(2), or the state statute of limitations for habeas petitions, Va. Code § 8.01-654(A)(2), it cannot serve as cause to excuse default of the DNA argument in Claim 5.[8] Edwards, 529 U.S. at 453. Pelletier offers no other cause and prejudice argument to excuse his default of Claim 5.

**Claim 8: Sufficiency of the Evidence**

The state habeas court found Pelletier's sufficiency of the evidence claim to be procedurally defaulted because he did not raise it on direct appeal. Thus, federal habeas review is also barred, absent cause and prejudice or actual innocence. Pelletier argues ineffective assistance of counsel as cause to excuse his default. However, Pelletier has not presented any such ineffective assistance claim to the Supreme Court of Virginia and would now be barred from doing so, pursuant to § 8.01-

---

[7] For the same reason, Claim 5 does not state grounds for habeas relief. The government denies a criminal defendant due process of law when it fails to disclose before trial evidence favorable to the defendant that is material either to guilt or punishment. See Brady v. Maryland, 373 U.S. 83, 87 (1963). New evidence is material only if there is a reasonable probability that, but for the prosecution's suppression of such evidence, the result of the proceeding would have been different. See Kyles v. Whitley, 514 U.S. 419, 434 (1995). There is, however, no Brady violation when the defendant, through the exercise of due diligence, could have obtained the evidence at issue from another source. See United States v. Kelly, 35 F.3d 929, 937 (4th Cir. 1994). Because Pelletier could have discovered the additional DNA test at the time of trial, there is no Brady violation here.

[8] Pelletier offers no cause for omitting this ineffective assistance claim from his state habeas petition.

15

654(B)(2). Thus, the ineffective assistance claim cannot serve as cause. Edwards, 529 U.S. at 453. He offers no other cause and prejudice argument to excuse his default of Claim 8.

### C. Actual Innocence

To show "actual innocence," the only miscarriage of justice recognized as sufficient to excuse procedural default, a petitioner must show that "it is more likely than not that no reasonable juror would have convicted him" if jurors had received specific, reliable evidence not presented at trial.[9] Schlup v. Delo, 513 U.S. 298, 327 (1995). The district judge must evaluate the credibility of the new evidence. See O'Dell v. Netherland, 95 F.3d 1214, 1250 (4th Cir. 1996).

Pelletier offers three pieces of "new evidence" that were not presented at trial: (1) the Cindy Garrison evidence that Andy Lettner had confessed to killing Meadows, (2) the additional DNA testing that Pelletier believes the government's DNA expert suppressed, which he believes would have proven that the stain on his shirt sleeve did not contain the victim's blood, and (3) Michael Taylor's excluded testimony about the victim's consensual sexual relationship with Pelletier. This evidence, however, whether taken individually or cumulatively, does not present a colorable claim of actual innocence so as to excuse his procedural defaults.

First, the Cindy Garrison letter itself, without a shred of direct or circumstantial evidence tying Lettner to the murder, is simply not credible. As the habeas court noted, given Pelletier's attempts to get Lettner to lie, no reasonable juror would "have accepted as true another obviously concocted attempt to shift the blame to an innocent person." Other than the letter, Pelletier does not demonstrate the existence of "new evidence" that Lettner committed the crime. He does not demonstrate that Cindy Garrison or either of the other two individuals would state under oath that they heard Lettner confess.

---

[9]A claim of actual innocence is not in itself a constitutional claim or a ground for habeas relief. See Herrera v. Collins, 506 U.S. 390 (1993). Rather, proof of actual innocence serves as a gateway through wich a habeas petitioner must pass to have his otherwise procedurally barred, constitutional claims considered on the merits. Id.

16

Second, the additional testing or interpretation of the DNA data obtained from the stain on his shirt and the excluded testimony from Taylor are not new evidence as contemplated by Schlup. Clearly, Pelletier and counsel knew of Taylor's testimony at the time of trial. They also knew of the DNA data to which Pelletier now refers. A new opinion or test result regarding evidence that was available at trial does not meet Schlup's "new evidence" requirement. Stewart v. Angelone, 149 F.3d 1170, *4 (4th Cir. 1996) (unpublished) (finding that no new evidence under Schlup where new doctor opined that health expert appointed to assist the defense should have done additional testing that might have defendant suffered from temporal lobe disorder) (citing Bannister v. Delo, 100 F.3d 610, 618 (8th Cir. 1997) ("putting a different spin on evidence that was presented to the jury does not satisfy the requirements set forth in Schlup."); Jones v. Delo, 56 F.3d 878, 883 (8th Cir. 1996) (mental health experts who had testified at trial that defendant was capable of deliberation and then changed their opinions to conclude on habeas review that defendant suffered from an organic brain disease at the time of the offenses was found to be "new evidence"). Pelletier's current difference of opinion with the state's DNA expert does not constitute new evidence under Schlup.

Third, the "new evidence," taken with all the other evidence against Pelletier, would not make it "more likely than not that no reasonable juror would have convicted him." Pelletier claims that the case against him was based on circumstantial evidence. In reality, however, the case against him turned on the jurors' assessment of the credibility of witnesses. From their verdict, it is clear that jurors believed Pelletier was telling the truth when he bragged to his friends about the rape and murder, and they did not believe his testimony that he was only joking when he confessed to rape and murder and that he only had consensual sex with Meadows before someone else killed her. Pelletier's new DNA evidence would not eliminate the possibility that Pelletier raped Meadows and murdered her, as he said he did, without getting any of her blood on his own clothes. Likewise, the additional testimony from Taylor would not eliminate the possibility that Pelletier had consensual sex with the victim on previous occasions, but raped and murdered her as he said he did on November 12, 2000. Reasonable jurors could clearly have discredited Pelletier's letter from Cindy

17

Case 7:06-cv-00582-JCT-mfu   Document 14   Filed 05/08/07   Page 17 of 18   Pageid#: 132

Garrison as yet another attempt to procure perjury. Thus, these items of evidence are not so persuasive that no reasonable jury would be persuaded to convict Pelletier on the other evidence and his confessions, and therefore, this evidence is not sufficient to meet the <u>Schlup</u> standard of actual innocence. Because Pelletier fails to show cause and prejudice or actual innocence to excuse default of Claims 3, 5 and 8, this court is procedurally barred from addressing these claims on the merits and will grant the motion to dismiss accordingly.

## III

In conclusion, the court finds that the motion to dismiss must be granted. Pelletier has failed to establish any claim of ineffective assistance and his other claims are procedurally barred from federal habeas review. An appropriate order shall be issued this day.

The petitioner is advised that he may appeal this decision, pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure, if a circuit court of appeals justice or this court issues a certificate of appealability, pursuant to 28 U.S.C. § 2253(c). A certificate of appealability may issue only if the applicant has made a substantial showing of the denial of a constitutional right. § 2253(c)(1). Petitioner has failed to demonstrate "a substantial showing of the denial of a constitutional right." Therefore, the court declines to issue any certificate of appealability pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure. <u>See</u> <u>Miller-El v. Cockrell</u>, 537 U.S. 322 (2003); <u>Slack v. McDaniel</u>, 529 U.S. 473 (2000). If petitioner intends to appeal, petitioner must file a notice of appeal with this court within 30 days of the date of entry of this opinion and the accompanying final order, or within such extended period as the court may grant pursuant to Rule 4(a)(5).

The Clerk is directed to send copies of this memorandum opinion and accompanying order to petitioner and to counsel of record for the respondent.

ENTER: This ___ day of May, 2007.

/s/ James C. Turk
Senior United States District Judge

18